Stryjewski *v.* Local Union No. 830, Appellant.

Argued November 22, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Richard Kirschner*, with him *Richard H. Markowitz*, and *Wilderman, Markowitz & Kirschner*, for appellants.

*Daniel Sherman*, for appellee.

OPINION BY MR. JUSTICE ROBERTS, May 4, 1973:

This case was before this Court earlier in *Stryjewski v. Local Union No. 830*, 426 Pa. 512, 233 A. 2d 264 (1967).[1] There, we affirmed the trial court's denial of a preliminary injunction. The majority's reasoning was that state court injunctive relief could not be obtained until the National Labor Relations Board had decided, either affirmatively or negatively, to assume jurisdiction.

During the pendency of that appeal (and prior to our decision there) the NLRB declined jurisdiction. Thereafter, the case proceeded to final adjudication in the Philadelphia Court of Common Pleas (Equity Division). Although the issue of continued picketing by the union was resolved by the parties prior to final hearing (thus obviating the need for injunctive relief), the Chancellor (SLOANE, J., now deceased) assessed damages against the defendant in the amount of $18,-000. Post-trial exceptions were timely filed and denied. The extent of this liabilty adjudication and its constitutionality are the central issues on this appeal.[2]

---

[1] BELL, C. J., and ROBERTS, J., dissented. COHEN, J., took no part in the consideration or decision of this case.

[2] Appellant also alleges that the Chancellor erred by granting relief on facts and issues not raised in the pleadings. Specifically,

It is well settled that ". . . once equitable jurisdiction has attached, Equity has jurisdiction to do *complete* justice between the parties and, inter alia, award damages for tort (or for breach of contract), as well as grant other equitable relief: . . ." *Wortex Mills v. Textile Workers U. of A.*, 380 Pa. 3, 11, 109 A. 2d 815, 819 (1954) (citations omitted). Further, as this Court stated in *Ackerman v. N. Huntingdon Twp. (et al.)*, 437 Pa. 49, 54-55, 261 A. 2d 570, 572-73 (1970): "As to monetary damages, once equity has assumed jurisdiction of an action it may retain jurisdiction to ensure a just result even if that result is merely a money decree." (Citations omitted.) Thus, as a threshold matter, we conclude that the equity court below had jurisdiction to enter a monetary decree, although no disposition was ultimately made of plaintiff's initial application for injunctive relief.

Further, it must be noted that although a state court has power to assess monetary damages, such damages are constitutionally permissible *only* where they compensate an injured party for damages sustained as a result of violent or otherwise unlawful picketing.[3] No damages are recoverable where the activity complained of consists of constitutionally protected peaceful picketing.

As the United States Supreme Court stated in *United Mine Workers v. Gibbs*: "Our opinions on this subject, frequently announced over weighty arguments in dissent that state remedies were being given too

appellant asserts that the evidence of violent and mass picketing, which occurred after February, 1967, should have been excluded as an allegation as to these facts was not contained in plaintiff-appellee's pleadings. This assertion is without merit, in light of Paragraph 7 of plaintiff's Complaint and Paragraph 4 of plaintiff's Reply to New Matter.

[3] See *United Mine Workers v. Gibbs*, 383 U.S. 715 at 729, 86 S. Ct. 1130 at 1140-41 (1966) and the cases cited therein.

broad scope, have approved only remedies carefully limited to the protection of the compelling state interest in the maintence of domestic peace. Thus, in San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775, *we read our prior decisions as only allowing 'the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order,'* id., at 247, 79 S. Ct. at 781, and noted that in Laburnum 'damages were restricted to the "damages directly and proximately caused by wrongful conduct chargeable to the defendants * * *"' as defined by the traditional law of torts. * * * Thus there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct.' Id., at 248, n.6, at 249, 79 S. Ct., at 782." 383 U.S. 715, 729-30, 86 S. Ct. 1130, 1141 (1966) (emphasis added).

Our task is not merely to ensure that the damages sustained were proximately caused by the challenged picketing and other activity, but rather is to ensure that such damages, to be constitutionally compensable, resulted solely from unlawful and violent activities which are without the protection of the first amendment.

When the denial of the preliminary injunction was before this Court in early 1967, the appellee made no allegation of violence or mass picketing. However, after our earlier opinion, supra, as the picketing continued by the Union into the Spring of 1967, some sporadic violence and mass picketing did ensue. The extent, duration and severity of such activities was never specifically found by the Chancellor in his adjudication. Rather, the Chancellor merely recited broad conclusions that such conduct had, in fact, occurred. As a result of this "factual determination", appellant was found liable in the amount of $18,000. Although the

Chancellor's adjudication states that "[A]ll damage suffered by Plaintiffs from the Union's activity was substantially caused by the Union's violent and mass activities and picketing . . .", nowhere are supportive and detailed facts found which sustain this determination.

Further, no computations exist within the adjudication which indicate how the damages were apportioned between the constitutionally protected (lawful) and unlawful picketing activities; nor does the opinion indicate the specific injuries to the plaintiff which support the $18,000 damage assessment.[4] Cf. *Wortex Mills v. Textile Workers U. of A.,* 380 Pa. 3, 15, 109 A. 2d 815, 821 (1954).

In view of this inadequate adjudication, the decree is vacated and the record remanded to the trial court with instructions to conduct an evidentiary hearing to determine the damages, if any, proximately caused by defendant's violent and unlawful actions. The court is further directed to make findings of fact and conclusions of law, in accordance with Pa. R. Civ. P. 1517. *Community Sports, Inc. v. Oakland Oaks,* 429 Pa. 412, 414, 240 A. 2d 491, 493 (1968); *Thompson v. Thompson,* 451 Pa. 546, 549, 301 A. 2d 644, 646 (1973).

Decree reversed and the record remanded with instructions. Each party to pay own costs.

Mr. Justice EAGEN and Mr. Justice NIX concur in the result.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

On the assumption that some of the picketing by the appellant union was "constitutionally" protected, the

---

[4] The Chancellor's damage decree was arrived at by merely adding together the prior year's (1966) profits and the current year's (1967) losses. His assessment attributed all losses sustained (including the loss of hypothetical profits) to the defendant, although the defendant's actions during 1967 were apparently, in large part, constitutionally protected.

Court today remands this case to the lower court for apportionment of the damages as between that caused by violent (and hence unlawful) picketing and that caused by peaceful picketing.[1] This assumption is in my opinion unjustified and on the record unjustifiable. I dissent, therefore, because none of the picketing, whether peaceful or violent, was protected either by the federal constitution or by federal labor policy. The right of a self-employed person without employees to be free from picketing, whether violent or not, is the value endangered by the Court's decision today.

## I.   Factual Background

It is necessary first to set out the facts in a manner more meaningful than the brief recitation by the majority. The plaintiffs—Edmund J. Stryjewski, his wife, Jean, and their son Edmund R. Stryjewski—operate as a family partnership the Tacony Beverage Distributing Co. in Northeast Philadelphia, a firm engaged in the retail sale of beer and other drinks. Prior to 1965 Tacony Beverage employed persons other than the immediate Stryjewski family and those employees were unionized. During 1965, however, Stryjewski suffered a heart attack and consequently changed the business to a self-service store involving only himself, his wife and his son.

---

[1] The damage proved by the plaintiff-appellees consisted solely of lost business caused by the picketing and does not consist of the type of damage normally associated with labor violence—broken windows, damaged vehicles, etc. Division of the plaintiffs' lost economic expectancies in the manner directed by this Court may therefore be a practical impossibiltiy.

The proceedings on remand will be seriously complicated by the fact that Judge SLOANE, who heard this protracted equity suit, has recently died. It would appear necessary for the plaintiffs not only to attempt to prove an allocation, but probably also to reintroduce their entire case.

Local Union No. 830 of the Brewery & Beer Distributor Drivers, Helpers & Platform Men, a Teamster affiliated labor organization (hereinafter "the Union"), represents workers in the beer distributing industry in Philadelphia County. In October of 1966 the Union negotiated with the Philadelphia Beer Distributors Association, a trade association of which Stryjewski is *not* a member, a collective bargaining agreement setting the wage standards within the trade association, the operating hours of the distributorships, and the number of paid legal holidays on which no distributor subject to the agreement would do business. The Union then demanded that Stryjewski sign the agreement, but he replied (through his attorney) that he was not a member of the trade association and furthermore that he had only one employee, his son. On January 10, 1967, when Stryjewski failed to appear to sign the agreement as the Union had demanded, Local 830 began to picket the Tacony Beverage Distributing Company.

Two days later, on January 12, 1967, Stryjewski, his wife and their son instituted an action in equity, seeking an injunction against the picketing and asking for damages caused by the Union's activities. The court of common pleas denied an application for a preliminary injunction on the basis that the dispute was arguably within the jurisdiction of the National Labor Relations Board (NLRB), notwithstanding the fact that it was clear the Stryjewski's son did not qualify as an "employee" under the federal labor statutes and notwithstanding the fact that the gross annual proceeds of the Tacony Beer Distributing Co. were less than half the amount required under current NLRB jurisdictional guidelines. We affirmed that denial. *Stryjewski v. Local Union No. 830*, 426 Pa. 512, 233 A. 2d 264 (1967).

The Union's picketing continued at Stryjewski's place of business from January 10 through January

20, 1967 and from February 9 through December 15, 1967. On May 23, 1967 the NLRB refused to issue a complaint on Stryjewski's unfair labor practice charge filed under Section 8(b)(7)(C) of the National Labor Management Relations Act, 29 U.S.C. §158(b)(7)(C) (1970), on the ground that Tacony Beer Distributing Co. did not have any employees and hence was not an employer within the meaning of that section of the Act.[2] That action by the NLRB gave the lower court here jurisdiction to proceed with Stryjewski's complaint.[3] A trial was conducted on December 15, 1967; January 15 and 18, 1968; and on August 26, 1968. On June 6, 1970, the chancellor issued an adjudication based on his review of the nine hundred page record and awarded the plaintiffs $18,000 in damages. Exceptions were filed and overruled by Judge SLOANE, sitting as the court *en banc,* and a final decree was entered on May 13, 1971.

The lower court found as a fact that "[t]he Union attempted to unionize the Plaintiffs' establishment because (1) it wanted Plaintiffs and their son to join the Union and (2) the Union wanted Plaintiffs to conform to opening and closing hours, generally agreed upon

---

[2] The NLRB's refusal to issue a complaint was *not* based on failure to satisfy the NLRB jurisdictional guidelines. Stryjewski's unfair labor practice charge was filed on the theory that the Union's picketing was "organizational", that it was directed towards "forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees. . . ." LMRA of 1947, §8(b)(7), 29 U.S.C. §158(b)(7). The Board may have thought it illogical to charge a union with unlawful organizational picketing of an employer who had no employees to organize.

[3] On May 5, 1967 the Pennsylvania Labor Relations Board had dismissed a Petition for Investigation and Certification of Representatives filed by Stryjewski for the reason that "no question has arisen concerning the representation of the employes of the Employer within the meaning of [the state labor relations act] since there are no employes."

and respected by competitors of the plaintiffs who had joined the Union." If that finding of fact is supported by evidence of record, this court will not disturb it on appeal. *Dozor Agency, Inc. v. Rosenberg and World Mutual Health and Accident Insurance Co.*, 431 Pa. 321, 246 A. 2d 330 (1968). At the hearing on the preliminary injunction both the president and the business agent of the Union testified that the purpose of the picketing was to "advertise the fact that [Stryjewski] is non-union and to attempt to organize the employees employed by [Stryjewski]."[4] By the Union's own spokesmen, then, the Union's purpose in picketing was in fact organization and recognition. It is true that at some point in time *after* the denial of the preliminary injunction and the affirmance of that decree by this Court and *before* final hearings, the Union apparently decided that to picket an independent employer who has no employees for purpose of "organization and recognition" was unwise if not unsound. Hence the Union's representatives spoke at the trial beginning December 15, 1967 of having the purpose of enforcing area-wide labor standards. The lower court, however, looked with an incredulous eye on this change in tune, and found as a fact that the Union had *both* purposes.[5]

---

[4] In our earlier opinion affirming the denial of plaintiffs' motion for a preliminary injunction, we noted that the Union was engaged in organizational picketing. 426 Pa. at 514.

[5] The contention by Union officers that the purpose of the picketing was to enforce union standard hours of business became doubly suspect when it developed, through Stryjewski, on the first day of trial, that in fact Stryjewski had operated his business for the past 15 years within the union-suggested hours and that he had a large sign in his window to that effect.

Judge SLOANE inquired whether Stryjewski would make a commitment to the court to observe union-standard business hours. Stryjewski replied that he would. The court then obtained a commitment from the Union to remove the pickets, and the picketing in fact finally ceased on that day, December 15, 1967.

As I view the issue presented, the dispute as to purpose is not legally significant, as will appear from the discussion to follow.

The chancellor also found that violence had flared upon the Union picket line on numerous occasions and that intimidating tactics had been employed by the Union not only against the members of the Stryjewski family, but against customers as well. For purposes of this dissent, it is unnecessary to review these incidents of violence; they are, however, similarly supported by the trial record.

## II.   Legal Analysis

The majority assumes that "peaceful picketing" is synonymous with "constitutionally protected picketing", and therefore concludes that the portion of plaintiffs' damages which were caused by the peaceful part of the Union's picketing are not "constitutionally" recoverable. The assumption is incorrect as a matter of federal law.

It is true, to be sure, that the landmark case of *Thornhill v. Alabama*, 310 U.S. 88, 84 L. Ed. 1093 (1940), does stand for the proposition that *some* peaceful picketing is constitutionally protected. In subsequent years, however, the Supreme Court decided a "series of cases . . . [which] established a broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, *could constitutionally enjoin peaceful picketing* aimed at preventing effectuation of that policy." *International Brotherhood of Teamsters, Local 695 v. Vogt, Inc.*, 354 U.S. 284, 293, 1 L. Ed. 2d 1347 (1957) (emphasis added). One case in that series was *Teamsters Local 309 v. Hanke*, 339 U.S. 470, 94 L. Ed. 995 (1950). There Mr. Justice FRANKFURTER, writing for the majority of the

Court, held that the Fourteenth and the First Amendments would not prevent a state (Washington) from making it unlawful for a union to post a single peaceful picket in an attempt to coerce *a family-operated used car lot* into observing the business hours portion of a collective bargaining agreement reached in negotiations between the union and *a trade association of used car dealers of which the family-owned concern was not a member.* The Court recognized that the State of Washington, in deciding to discourage union attempts to coerce non-union and self-employed persons into obeying union demands, had struck a balance between "competing social-economic interests and viewpoints". The opinion continued: "Unions obviously are concerned not to have union standards undermined by non-union shops. This interest penetrates into self-employer shops. On the other hand, some of our profoundest thinkers from Jefferson to Brandeis have stressed the importance to a democratic society of encouraging self-employer economic units as a counter-movement to what are deemed to be the dangers inherent in excessive concentration of economic power." 339 U.S. at 475. As to this balancing problem, Mr. Justice FRANKFURTER concluded, the First Amendment has nothing to say. If the state chooses to prefer the interest of the non-union, self-employed economic unit to the interest of the union in enforcing area-wide labor standards, that decision could not be faulted under the Constitution.

It is apparent that *Teamsters Local 309 v. Hanke,* supra, is substantially identical with the case at bar, and that it effectively undermines the rationale of the Court in this case.[6] That *Hanke* continues to be good

---

[6] The majority's belief that peaceful picketing is always constitutionally protected is not only contrary to *Teamsters Local 309 v. Hanke,* supra, but is contrary as well to a long line of decisions of this Court, all of which hold that peaceful picketing may be enjoined altogether where the purpose is unlawful. See, e.g., *North-*

562

law is clear from *Amalgamated Food Employees, Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 314, 20 L. Ed. 2d 603 (1968), in which it was cited with approval.[7]

ampton Area Joint School Authority v. Bldg. and Const. Trades Council of Allentown, 396 Pa. 565, 152 A. 2d 688 (1959) ; West Penn Township School Dist. v. Electrical Workers, 396 Pa. 408, 145 A. 2d 258 (1958) ; Fountain Hill Underwear Mills v. Amalgamated Clothing Workers Union, 393 Pa. 385, 143 A. 2d 354 (1958) ; Baderak v. Bldg. and Const. Trades Council, 380 Pa. 477, 112 A. 2d 170 (1955) ; Sansom House Enterprises v. Waiters & Waitresses Union, Local 301, 382 Pa. 476, 115 A. 2d 746 (1955) ; Wortex Mills v. Textile Workers Union of America, 369 Pa. 359, 85 A. 2d 851 (1952) ; Phillips v. United Bro. of Carpenters and Joiners, 362 Pa. 78, 66 A. 2d 227 (1949) ; Wilbank v. Chester and Delaware Counties Bartenders, Hotel and Restaurant Employees Union, Local 677, 360 Pa. 48, 60 A. 2d 21 (1948).

It should be noted additionally that the majority's reliance on *United Mine Workers v. Gibbs*, 383 U.S. 715, 16 L. Ed. 2d 218 (1966), for the proposition that peaceful picketing is constitutionally protected is misplaced. *Gibbs* does not deal with the question of First Amendment protection for peaceful picketing. What *Gibbs* holds is that where there is both peaceful picketing within the policy of the LMRA and violent picketing, and where the two are separable, then federal labor policy may not be defeated by permitting recovery of damages caused by the part of the picketing within the federal policy, i.e., the peaceful part. (In *Gibbs* the employer, Consolidation Coal Co., had been found by the NLRB to have unlawfully assisted the UMW's rival Southern Labor Union in violation of §8(a)(2) of the LMRA, 29 U.S.C. §158(a)(2), and hence the *peaceful* part of the UMW picketing was in protest of an employer unfair labor practice.) In the case at bar, however, there was no picketing, peaceful or otherwise, within the policy of the LMRA.

[7] "The majority of the cases from this Court relied on by respondents, in support of their contention that picketing can be subjected to a blanket prohibition in some instances by the States, involved picketing that was found either to have been directed at an illegal end, e.g., Giboney v. Empire Storage & Ice Co., 336 U.S. 490 (1949) ; Building Service Employees Local 262 v. Gazzam, 339 U. S. 532 (1950) ; Plumbers Local 10 v. Graham, 345 U.S. 192 (1953), or to have been directed at coercing a decision by an employer which,

Although there is no First Amendment obstacle which prevents the Stryjewskis from recovering damages for the injury to their business, the question remains whether they can recover damages in this action and, if so, how much.

*Teamsters Local 309 v. Hanke,* supra, was decided in 1950. Three years prior to that decision, Congress had already made the decision which the Supreme Court in *Hanke* had said could constitutionally be made either way. In 1947 Congress added to Section 8 of the National Labor Relations Act a subsection (b), which specified a number of labor organization unfair labor practices. Labor Management Relations Act of 1947 (LMRA), §8(b), Pub. L. No. 101, 80th Cong., 1st Sess. (1947), 61 Stat. 136, as amended, 29 U.S.C. §158(b)(1970). Section 8(b)(4)(A) of the LMRA reads as follows:

"It shall be an unfair labor practice for a labor organization or its agents to . . . threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is:

. . .

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization. . . ." This provision has withstood constitutional attack for the same reason that the State of Washington's policy in *Hanke,* supra, has survived.

---

although in itself legal, could validly be required by the State to be left to the employer's free choice, e.g., Carpenters Local 213 v. Ritter's Cafe, 315 U.S. 722 (1942) (secondary boycott) ; Teamsters Local 309 v. Hanke, 339 U.S. 470 (1950) (self-employer union shop). Compare NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675 (1951) with International Bro. of Electrical Workers v. NLRB, 341 U.S. 694 (1951)." *Amalgamated Food Employees, Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 314, 20 L. Ed. 2d 603 (1968).

*Printing Specialties and Paper Converters Union Local 388, A.F.L. v. LeBaron,* 171 F. 2d 331 (9th Cir. 1948); *Yager v. Operating Engineers, Local 12,* 133 F. Supp. 362 (D.C. Cal. 1955). It expresses a national policy that unions, authorized under the LMRA to represent employees in bargaining collectively with employers, should not apply pressure to "any employer or self-employed person" either to join a union (and hence become subject to union rules on working hours and holidays) *or* to join an employer organization, such as the beer distributors' association with whom the Union here has a contract. It is clear under this provision that *peaceful picketing* for the proscribed purpose is unlawful. *NLRB v. Teamsters, Local 830,* 281 F. 2d 319 (3d Cir. 1960) (involving the appellant here).

It is apparent to me that the appellant-Union by its conduct here violated that federal policy. The Union itself characterized its purpose as that of forcing Stryjewski into compliance with the holidays and working hours determined by the Union and the trade association. The conclusion is inescapable that the Union sought to achieve this end by coercing the appellees into signing the union-trade association agreement.[8] I can see no meaningful distinction here between the Union's attempt to coerce Stryjewski into signing the association's agreement and an attempt to coerce Stryjewski into formally joining the association. Stryjewski's freedom of action as an independent entrepreneur is as much lost by binding himself to association policies as by binding himself to association membership. Cf. *Locals 8 & 92, Longshoremen,* 126 NLRB 172 (1960) (formal demand that employer join an employer organization is not required).

---

[8] The record contains a letter from Local Union No. 830 to Stryjewski demanding that he appear at a stated time and place and sign the union-trade association agreement.

The LMRA of 1947 also provided that persons injured by certain types of unlawful union conduct might recover damages:

§303. "(a) It shall be unlawful for the purpose of this section only in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of the National Labor Relations Act, as amended.

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or *in any other court having jurisdiction of the parties,* and shall recover the damages sustained by him and the cost of the suit." LMRA of 1947, §303, as amended, 29 U.S.C. §187 (1970) (emphasis added). The picketing by Union 830 here was a violation of section 8(b)(4) of the LMRA and, assuming that Stryjewski's beer distributorship was an industry "affecting commerce", the plaintiff-appellee could assert in our state courts this federal cause of action, a federal cause of action which we are obligated under the Supremacy Clause of the Constitution to honor. *Testa v. Katt,* 330 U.S. 386, 91 L. Ed. 967 (1947). Stryjewski's testimony on the first day of trial, December 15, 1967, establishes that prior to institution of the picketing by Local Union No. 830, the inventory and sales of the Tacony Beverage Distributing Co. (Stryjewski's firm) included nationally known brands produced outside Pennsylvania, but that throughout the picketing Stryjewski was unable to receive deliveries from his normal sources of supply (the delivery truck drivers being members of the appellant Union), and hence Stryjewski was compelled to purchase beer "upstate". Throughout the strike, Stryjewski testified, his inventory was com-

prised exclusively of locally produced beer. There can be no question, therefore, that appellees proved that the picketing had an effect on commerce.[9]

Since the plaintiffs' case presented a federal cause of action, it is incumbent on the courts of this state to honor it. This involves allowing recovery of lost profits in 1967 (the year of the picketing), *Mine Workers v. Patton*, 211 F. 2d 742 (4th Cir. 1954) ; *Abbott v. Plumbers, Local 142*, 63 Labor Cases para. 11,046 (5th Cir. 1970) ; recovery of actual operating losses in 1967, *Gulf Coast Bldg. & Supply Co., Inc. v. Electric Workers, Local 480*, 63 Labor Cases para. 10,980 (5th Cir. 1970) ; *Mine Workers v. Patton*, 211 F. 2d 742 (4th Cir. 1954) ; and finally recovery of "the cost of the suit" (i.e., the attorneys' fees of some $3,000 included

---

[9] The requirement in section 303(a) of the LMRA (damage suits against unions) that the industry or activity "affect commerce" is a repetition of the general jurisdictional definition of "commerce" found in section 2(7) of the LMRA:

"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce."

The Supreme Court of the United States has held that this language in the LMRA is sufficient to evoke the full power of the federal government under the interstate commerce clause, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 81 L. Ed. 893 (1937). That power is sufficient to reach and regulate an activity that has *any* effect, direct or remote, on the flow of interstate commerce. *Katzenbach v. McClung*, 379 U.S. 294, 13 L. Ed. 2d 290 (1964) ; *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 13 L. Ed. 2d 258 (1964).

The jurisdictional reach of the commerce clause is, of course, to be distinguished from the power of the NLRB to decline jurisdiction over any labor dispute "where the effect . . . on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." Section 14(c)(1) of the LMRA, 29 U.S.C. §164(c)(1). The current NLRB jurisdictional yardstick for retail businesses such as appellees' is $500,000 gross yearly value. 1 CCH Labor Law Rep. §1610, at 5407. Stryjewski never exceeded $230,000.

in the operating loss figure used by the lower court in reaching the damage figure of $18,000), *Robertson Associates, Inc. v. Plumbers, Local 519,* 429 F. 2d 520 (5th Cir. 1970); *Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co.,* 384 F. 2d 101 (5th Cir. 1967).[10]

Even were the plaintiff-appellees here not entitled to relief under sections 8(b)(4)(A) and 303(a), (b) of the LMRA, it is clear that a state cause of action has been asserted which would permit relief under our state law. This Court has on several occasions held to be unlawful peaceful picketing by organized labor which was aimed at self-employed persons. *Grimaldi v. Journeymen Barbers, Local 9,* 397 Pa. 1, 153 A. 2d 214 (1959); *MacDonald v. Feldman,* 393 Pa. 274, 142 A. 2d 1 (1958); *Bright v. Pittsburgh Musical Society, American Federation of Musicians, Local 60,* 379 Pa.

---

[10] Before leaving the subject of federal policy, one further observation is in order. The appellant-Union cites *Meat Cutters, Local 189 v. Jewel Tea Co.,* 381 U.S. 676, 14 L. Ed. 2d 640 (1965), for the proposition that it is within the policy of the LMRA (and hence not violative of section 2 of the Sherman Antitrust Law) for a union, in bargaining with a multi-employer group, to attempt to impose on all members of the group uniform restrictions on industry working hours. In that case, however, the Union was attempting to settle, as to employer with whom it could bargain within the policy of the LMRA, the terms and conditions of employment of employees.

In the present case, in contrast, it is clear that there are no employees for Union 830 to represent, *and* it is equally clear that it is contrary to the policy of the LMRA for this Union to approach and coerce this self-employed beer distributor into accepting union-determined working hours. It is thus a distinct possibility that had Stryjewski signed the document presented to him by the Union, he thereby would have entered into an agreement violative of the antitrust laws and could have been subjected to possible treble damage liability or criminal conviction. See *United States v. Olympia Provision & Baking Co.,* 282 F. Supp. 819 (S.D.N.Y. 1968), aff'd. per curiam sub nom. *Meat Cutters Local 627 v. United States,* 393 U.S. 480 (1969); *Taylor v. Horseshoers, Local 7,* 353 F. 2d 593 (4th Cir. 1965), cert. denied, 384 U.S. 969 (1966).

335, 108 A. 2d 810 (1954). See also *Thompson v. Motion Pictures Machine Operators,* 26 Labor Cases para. 68,574 (Ct. Cm. Pls. Allegheny Cnty. 1954). Other states also forbid organized labor to attempt the organization of self-employed persons. See, e.g., *Simon v. Barbers, Local No. 315,* 11 N.J. 448, 94 A2d 840 (1953); *Riviello v. Barbers, Local No. 148,* 109 Cal. App. 2d 123, 240 P. 2d 361 (1952).

For the reasons indicated, I think the decree of the court below was fully supported by federal labor law, and also the law of this Commonwealth. I therefore think the decree below should be affirmed.

Mr. Chief Justice JONES joins in this dissenting opinion.